### UNITED STATES v. MARACHOW-SKY et al.
#### No. 10540, 10541.

United States Court of Appeals
Seventh Circuit.

Jan. 7, 1953.

Rehearing Denied Feb. 6, 1953.

in the bankruptcy proceedings of the Portage Wholesale Company in support of her amended claim for $126,780.09 filed against that estate. Counts 2, 4, 6, 8, 10, 12 and 14 charged false oaths upon the part of Jake Marachowsky in the same proceeding in support of Belle Marachowsky's claim. Count 15, as we have observed, charged conspiracy by both to present a false claim against the debtor estate and to make false oaths in such proceeding in relation thereto. Belle Marachowsky was sentenced to two years in the custody of the Attorney General and to pay a fine of $10,000. Jake Marachowsky, upon each of the substantive counts, was sentenced to five years in the custody of the Attorney General, all the sentences to run concurrently. Upon counts 2, 4, 6, 8 and 10, he was fined the sum of $5000 each, or $25,000 in all. On the 15th count he was sentenced to two years in the custody of the Attorney General, to run concurrently with the other sentences.

Upon appeal defendants urge that the evidence adduced by the government was not sufficient to meet the requirements abiding in prosecutions for taking false oaths; that the court should have allowed their motions for acquittal, and that the court committed certain procedural errors. In view of the first mentioned contention, it becomes necessary to examine, somewhat in detail, the evidence submitted by the government.

Among the salient facts as established by the evidence viewed in its aspects most favorable to the government are the following. The Portage Wholesale Company was a corporation doing business in Portage, Wisconsin, of which the defendant, Jake Marachowsky, owner of 52 per cent of the capital stock, was president and manager; associated with him was his brother Jule. The company was engaged in buying and selling butter, cheese, corn, syrup, dextrose and other food products during the years 1945 and 1946, while price control was in effect. It bought merchandise apparently within controlled prices and disposed of the

Jacob Geffs, Janesville, Wis., Edwin Conrad, Madison, Wis., David A. Canel, Chicago, Ill., Leonard A. Canel, Chicago, Ill., of counsel, for appellant.

Frank L. Nikolay, U. S. Atty., Madison, Wis., Thomas E. Fairchild, Verona, Wis., for appellee.

Before MAJOR, Chief Judge, and KERNER[1] and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Defendants, indicted in fourteen counts charging the making of false oaths in a bankruptcy proceeding and in one, the 15th, with conspiracy, having been found guilty and sentenced, perfected this appeal. They are man and wife. It should be observed, however, in order to avoid confusion, that Belle Marachowsky's maiden name was Canel; that she married Joseph Blitz, divorced him and resumed her maiden name, and, later, married Jake Marachowsky.

Counts 1, 3, 5, 7, 9, 11 and 13 charged Belle Marachowsky with making false oaths

---

1. Judge Kerner participated in the consideration and disposition of this case but

died before the formal opinion was announced.

same on the black market at sharply increased over-ceiling prices.

Preceding those years Joe Blitz and defendant Belle Marachowsky, then Belle Blitz, lived at Chippewa Falls, Wisconsin. In December, 1944, they came to Portage where Joe was employed by the company. He remained there, however, only a short time, after which he proceeded to New York, where he acted as agent of the company, selling the products in eastern territory. Very frequently the larger part of his sales prices was received in currency and placed in envelopes which, from time to time, he and his wife carried from New York back to Portage. Blitz received his instructions from Jake Marachowsky by letters and unsigned typewritten memoranda. Many of these instructed Joe to get from 15 to 16 cents per pound for corn syrup and 18 to 19 cents per pound for dextrose, at a time when the legal maximum price was 5 cents and 7 cents respectively. Frequently cars of merchandise were shipped on open bill of lading consigned to Blitz, who received and delivered the bill of lading to others, collecting the sales price fixed as aforesaid. If a car was shipped with draft attached to the bill of lading, Joe would pay the draft with cash received from selling the company's products and then sell the car. He was employed on a commission basis; the company always owned the merchandise and never sold it to him.

One John Olson was, during the year 1946, employed by the company to purchase products in Iowa and Nebraska. Jake supplied Olson with signed checks of the company which Olson filled in and used in making purchases. Olson also received from the company, cash aggregating some $75,000, which he used in buying products for the company. Olson received all his instructions from Jake and none from Belle, although at Jake's request he was handed money by Belle in envelopes, for which he accounted to the company. He was working for the Portage Wholesale Company and considered Belle its agent.

Price ceilings terminating on June 30, 1946 were never renewed, so far as corn was concerned, but were placed in force once more on corn syrup and dextrose after July 25, 1946. The company paid Burbridge of Omaha a finder's fee for corn, which, before ceilings were removed, was $200 per car and thereafter $100 per car. This firm dealt with Jake and Olson, never with Belle. This corn was shipped from Nebraska and Iowa to brokers in Chicago on sight draft. The brokers paid the drafts and delivered the corn to the refinery, American Maize Products Company. If the market price dropped while the goods were in transit, the drafts were reduced and the company paid the difference to the elevator which had supplied the corn. For every six cars of corn so made available to American Maize, the Portage Wholesale Company was permitted to buy from the refinery one car of dextrose, or two cars of corn syrup, which were then shipped to Portage with draft attached. The company paid for them and reshipped them, invoicing them to Blitz in New York within the ceiling price, who then sold them at prices suggested by Jake Marachowsky, in excess of ceilings.

Despite the volume of business transacted, the company apparently found itself without funds in January, 1947, when it filed a petition for arrangement under Chapter XI of the Bankruptcy Act, 11 U.S. C.A. § 701 et seq.

About a week before the debtor proceeding was instituted, Belle brought suit against the company for some $36,000 which she claimed to have loaned to it. At about the same time, Joe Blitz commenced divorce proceedings against Belle who, on adverse examination, testified that this $36,000 was all the company owed her. However, in August, 1947, she filed claim against the debtor for $67,926.06. On October 14, 1947, she was divorced from Blitz and resumed her maiden name, Canel. On October 20, 1947 she filed a bill of particulars of her claim in which she said that no notes or other written evidence existed to support her demand except certain checks listed therein. On March 22, 1948, at an adverse examination, Belle produced, for the first time, a series of invoices, known as Exhibits 11 to 16 inclusive, partly in Jake's handwriting and partly in Belle's, purporting to have been prepared in 1946. No

one had ever seen these invoices before March 22, 1948 except Jake and herself. The circumstances appearing in the record fully support the government's contention that they were fraudulently manufactured solely to support Belle's claim.

Some three months later she filed an amended claim for $126,780.09. At a hearing in July and August, 1948, before the referee, Belle and Jake gave the testimony charged in the indictment to have been false. The company was ultimately adjudicated bankrupt and claims against it can not be paid in full. In November, 1948, Belle and Jake were married.

With this sketchy picture in mind, we divert our discussion for the time being to the statute and the authorities. The wording, "knowingly and fraudulently makes a false oath" in a bankruptcy matter, is that of the revised criminal code, Title 18, Sec. 152, superseding a similar provision in the Bankruptcy Act, Sec. 52, Title 11 U.S.C. (1940 Ed.), in effect removing the latter entirely from the Bankruptcy Act but including it in the revised code, under Chapter 9 as a part of "Bankruptcy." Consequently the perjury statute, 18 U.S.C. § 1621 is not involved here, previously Title 18 U.S.C. (1946 Ed.) Sec. 231. One accused of false swearing in a bankruptcy proceeding was punishable under either former Sec. 52 of Title 11 or the general perjury statute, the punishment only under Sec. 52 being different. Epstein v. U. S., 7 Cir., 196 F. 354.

Various decisions have from time to time indicated that there is a legal difference between the crime of a false oath in bankruptcy proceedings and perjury. This Court, in Goetz v. U. S., 59 F.2d 511, 512, in reviewing a conviction under the earlier provision of the Bankruptcy Act, similar in all ways to the present one, said: "Appellant seeks to interpret each count of the indictment in the light of the statute and decisions relating to perjury, and they are not applicable to the instant case." Recently, Judge Kerner, speaking for the court, in U. S. v. Lynch, 7 Cir., 180 F.2d 696, said, at page 701: "But this court has held that proof of false oath in bankruptcy need not contain all of the elements of perjury." In Wechsler v. U. S., 2 Cir., 158 F.

579, the court held that the bankruptcy provision did not create a new offense but merely prescribes a different penalty for the crime of perjury already defined by Congress, when committed in or in relation to bankruptcy proceeding. And in Schonfeld v. U. S., 2 Cir., 277 F. 934, 938, the same court said: "False swearing in bankruptcy is not equal in enormity to the crime of perjury denounced by the general statute. Kahn v. U. S., 2 Cir., 214 F. 54, 130 C.C.A. 494. The burden of proof required in perjury cases is not applicable to the perjury under the Bankruptcy Act, for the ancient rule of common law requiring two witnesses to contradict the plaintiff in error's oath has been practically annulled, and the burden now upon the government is to prove beyond a reasonable doubt the guilt of the plaintiff in error of false swearing. Kahn v. U. S., supra." By retaining the same wording, in the revised criminal code, it may well be urged that Congress tacitly approved the interpretations of such words by the courts under the previous statute. Morris Plan Industrial Bank v. Finn, 2 Cir., 149 F.2d 591. However, other decisions refuse to distinguish between the two crimes. In view of our conclusions, it is not necessary that we ground our decision upon any possible distinction between the two offenses.

In view of the uniqueness of the rule commonly held applicable in perjury cases, we think it well to refer to judicial discussions of this procedural standard. U. S. v. Wood, 1840, 14 Pet. 430, 39 U.S. 430, 10 L. Ed. 527, contains a resume of the common-law rule and the relaxations recognized at the time of that decision. That case involved a statute forbidding false oaths by an importer. Specifically the court said: "We thus see that this rule, in its proper application, has been expanded beyond its literal terms, as cases have occurred in which proofs have been offered equivalent to the end intended to be accomplished by the rule. * * * if it shall be seen, that the fact to be proved is an act of the defendant, which, from its nature, can be concealed from all others except him whose cooperation was necessary before the act could be complete, then the admissions and declarations by the defendants, either in

writing or to others, in relation to the act, become evidence. It is no longer a question of the quality but of the quantity of evidence," and concluded that "in order to convict the defendant of the crime charged in the indictment, it is not necessary on the part of the prosecution to produce a living witness; if the jury shall believe the evidence from the written testimony sufficient to establish the charge that the defendant made a false and corrupt oath as to the cost of the goods imported * * *."

In Hammer v. U. S., 271 U.S. 620, at page 627, 46 S.Ct. 603, at page 604, 70 L. Ed. 1118, the language is "That, in some cases, the falsity charged may be shown by evidence other than the testimony of living witnesses, is forcibly shown by the opinion of this court in United States v. Wood, 14 Pet. 430, 443, 10 L.Ed. 527. That case shows that the rule, which forbids conviction on the unsupported testimony of one witness as to falsity of the matter alleged as perjury, does not relate to the kind or amount of other evidence required to establish that fact. Undoubtedly in some cases documents emanating from the accused and the attending circumstances may constitute better evidence of such falsity than any amount of oral testimony."

In United States v. Buckner, 2 Cir., 118 F.2d 468, at page 469, the court said: " * * * the repeated admissions of the defendant that her testimony before the grand jury was false was a fair substitute for the confirmatory testimony which is generally required in perjury cases." The court continued: "In United States v. Wood, 14 Pet. 430, 439, 441, 10 L.Ed. 527, * * *. The Supreme Court held that even a single witness to the *corpus delicti* is unnecessary when the truth of statements alleged to be perjured is 'directly disproved by documentary or written testimony springing from [the defendant] himself, with circumstances showing the corrupt intent. * * * ' In that action the defendant's own invoice book and letters contradicted the cost which was set forth in his so-called 'importer's oath'. These papers were held sufficient proof to justify submission of the case to the jury al-

though no witness of the *corpus delicti* was produced."

In United States v. Remington, 2 Cir., 191 F.2d 246, at page 249, where no witness testified as to the falsity charged and the proof was entirely circumstantial, the court said: "But the law is well settled that his declarations, if oral, will not satisfy the rule, although they will if written and adequately corroborated.[7] This distinction was laid down in United States v. Wood, 14 Pet. 430, 10 L.Ed. 527, which has been often followed.[8] Since only written declarations will suffice, it follows that if the critical issue must be proved by 'direct' evidence, there could be no conviction unless the accused had made contradictory written declarations. But it is clear that perjury convictions are not limited to such cases. Hence it must be that the rule peculiar to perjury as to the character of the proof, means that it is the facts from which the jury may infer the accused's state of mind that must be proved by 'direct' evidence. And this view is confirmed by Chief Justice Vinson's opinion in American Communications Ass'n v. Douds, 339 U.S. 382, 411, 70 S.Ct. 674, 690, 94 L.Ed. 925, where it is said: ' * * * while objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does. * * * False swearing in signing the affidavit must, as in other cases where mental state is in issue, be proved by the outward manifestations of state of mind. In the absence of such manifestations, which are as much "overt acts" as the act of joining the Communist Party, there can be no successful prosecution for false swearing.' "

"7. We lay to one side a possible exception as to contradictory oral declarations made by the accused under oath, as the case at bar involves no declarations of this character. See Wigmore, Evidence, 3rd Ed. § 2043."

"8. Clayton v. United States, 4 Cir., 284 F. 537, 540; Phair v. United States, 3 Cir., 60 F.2d 953, 954; Hart v. United States, 9 Cir., 131 F.2d 59, 61; Fotie v. United States, 8 Cir., 137 F.2d 831, 840. Compare United States v. Harris, 311 U.S. 292, 61 S.Ct. 217, 85 L.Ed. 196."

In Kahn v. U. S., 2 Cir., 214 F. 54, 56, after commenting that a prosecution under

the earlier Bankruptcy Act, Act of July 1, 1898, Sec. 29, sub. "b" (2), evidently was regarded by Congress as not equal in degree to the crime of perjury, the court continued: "If this view of the situation be correct it is manifest that the burden of proof in perjury cases is not necessarily applicable here", but added "However, the ancient rule * * * has been practically annulled and at present the rule in several jurisdictions means hardly more than the common-law rule that the defendant must be proved guilty beyond a reasonable doubt." After citing and commenting on certain decisions including U. S. v. Wood, 14 Pet. 430, 39 U.S. 430, 10 L.Ed. 527, the court concluded: "Without pursuing the subject further we think that the ancient rule has become inapplicable to modern conditions and has been relaxed to such an extent that evidence which not only contradicts the testimony of the defendant but so far preponderates it as to justify the jury in finding that the latter was not only false but was made by the defendant knowingly and fraudulently is all that it required to prove a crime under 29b(2) of the Bankruptcy Act."

Concerning corroboration, the third circuit in United States v. Margolis, 138 F. 2d 1002, said at page 1003: "In United States v. Palese, 3 Cir., 133 F.2d 600, 603, 604, we held that a conviction could be sustained if competent evidence corroborated the falsity of the oath and that particular circumstances which indicated its falsity need not be corroborated." In United States v. Palese, 3 Cir., 133 F.2d 600, 602, after concluding that it would adhere to the rule requiring at least one living witness and corroboration, the court added that the rule had been subjected to much "well reasoned criticism" citing 7 Wigmore on Evidence, 3rd Ed. §§ 2040–2043; Marvel v. State, 1925, 3 W.W.Harr. 110, 33 Del. 110, 131 A. 317, 42 A.L.R. 1058, and continued: "Thus in Goins v. United States, 4 Cir., 1938, 99 F.2d 147, 149 the court said: 'It may well be doubted whether any distinction should now be made between the proof necessary to convict of perjury and that necessary to convict of other crimes. * * * The old "oath against oath" reasoning of the earlier decisions is without force now that the defendant is allowed to take the stand and that corroboration sufficient to satisfy the jury of the falsity of the oath may well arise from his demeanor and manner of testifying.'" In State v. Storey, 148 Minn. 398, 182 N.W. 613, 15 A.L.R. 629, the court pointed out forcibly that it is inconsistent to hold that evidence which is of the quality sufficient to hang a man for murder is insufficient to convict him of perjury.

■ Thus it seems apparent that the tendency has been to relax the rule governing the strictness of proof required in perjury cases and that, only with obvious reluctance, have the courts adhered to the harsh postulate which requires in a perjury case a greater degree of proof than in a murder case. However, despite this growing drift toward substitution of a saner rule requiring only that the evidence be sufficient to prove guilt beyond all reasonable doubt, in view of the fact that the District Court adhered to the old precepts and in view of our conclusions, we shall do likewise in disposition of this appeal.

■ Counts 1 and 2 specifically respectively charge Belle and Jake with false oaths with reference to a transaction with one Frank Figge upon which a part of her claim was based. Belle's testimony was that $32,999.17, which came to Portage Wholesale Company from Figge was hers; that she had given it to Figge partially personally and partially through Olson. Jake's allegedly false oath in this respect was that he understood this money to be Belle's.

The evidence adduced by the government bearing upon the issue of falsity of these statements was that Figge met Olson, a representative of Portage Wholesale Company, who was in search of butter for the company, in 1946 in Omaha and sold him butter; that, later in the year, Figge bought an additional creamery and needed capital to finance the purchase; that Olson agreed that the company would advance him money for butter and eventually filled in blank checks of the wholesale company, signed by Jake as president and handed by him to Olson, who delivered them to

Figge, totalling $99,384.10. Certain deliveries were made to the company resulting, in July, in a balance due from Figge to Portage Wholesale Company, on account of over-payment to him, of $33,000. For this Figge wrote a check to the company and delivered it to Olson, who later returned it to Figge, saying that Jake wanted cash. On July 12, Figge had his bank wire the $33,000 less charges, to Home Savings Bank, Milwaukee, for the credit of Portage Wholesale Company. On the company's books the payment was, apparently by mistake, credited to another creamery in Nebraska and remained so credited at the time the company filed its proceeding in the bankruptcy court. Jake told the company accountant that this sum was due Portage Wholesale Company for money advanced for butter not delivered. When the receiver was appointed, Jake made no claim that the money did not belong to the company or that Belle had any interest in it.

The material issue on these counts, then, was as to whether the $33,000 was money which Belle had paid to Figge as she swore before the referee. Figge testified that he had met Belle once or twice, but that he never had any business transactions with her, and never received from her any money, any letter, telegram or other communication, as she had testified. Here was direct testimony by one witness contradicting the truth of her testimony, in compliance with the requirements of the more strict rules governing proof of false oaths.

The corroborating evidence is that above related and, in addition, that on April 11, 1947, Belle had testified, in other litigation, that the debt due her from Portage Wholesale Company was $36,000 for money she had loaned that company in cash and by check; that the company owed her for nothing more, though she later swore in the bankruptcy court that the company owed her over $126,000. Her further acts, relied upon by the government as inconsistent with her sworn testimony and corroborative of the testimony of Figge as to the falsity of her statement that she had advanced him almost $100,000, despite her admission in 1947 that the company owed her only $36,000, are that, in addition, she

first swore in the bankruptcy court that the company owed her $67,926; and, later, that it owed her $126,000. In her claim she swore that no written evidence existed to support it except certain specified checks; yet, in 1948, in the bankruptcy proceeding, she produced, to support her claim, six invoices, partly in her handwriting and partly in that of Jake, purporting to have been in existence since 1946, at the time when she sued for $36,000 and swore that was all the company owed her, and at the time when she made oath that no written evidence of her debt existed. Yet these written invoices purported to show the entire finally claimed debt. Further corroboration of Figge's testimony showing the falsity of Belle's claim that she gave the money to him lies in the fact that the company's checks to Figge, totalling $99,384.10 showed payment by the company to Figge. Many other corroborating circumstances appear in the record. Taken all together the proof includes the direct testimony of a witness and ample facts and circumstances corroborating the alleged falsity of the oaths of both Belle and Jake in the bankruptcy proceedings, in this respect.

In counts 3 and 4 it was charged that both Jake and Belle made false oaths before the referee in that Belle testified that while she was in New York, Jake telephoned her directing her to give one Spiritus the money necessary to take up a sight-draft accompanying a bill of lading for a car of butter shipped to New York; that she gave Spiritus $27,240.57 in currency for that purpose, and that later Spiritus repaid Portage Wholesale Company for her credit. Jake swore that when the car reached New York, the company did not have the money to take up the draft; that he asked Belle to advance it; that after Spiritus took up the draft and secured release of the car, he, Spiritus, remitted to Portage Wholesale Company and that when the payment came in, he credited it to Belle.

The evidence adduced by the government was that the car was shipped from a creamery in Nebraska consigned to Portage Wholesale Company, care of Joe Blitz, New York. When notice of the shipment came

to the company, c/o of Blitz, the latter notified Spiritus, who had ordered the butter from the company. Someone other than Spiritus paid the draft, but he received an invoice for the car from the company and mailed to the company his check for the purchase price. On the company books, the face amount of the invoice was charged to Spiritus and the payment credited to him. Spiritus testified that he never had any transactions with Belle; that he never received any money from her; that she never discussed with him any of the transactions he had with Portage Wholesale Company with whom alone he dealt and to whom he remitted payment.

Thus we have the direct testimony of Spiritus that the oaths of Belle and Jake in the bankruptcy proceedings were false and corroborating evidence of that falsity in the circumstances above related, and in the further circumstances that Spiritus' records reflected no receipts of money by him from Belle to pay the draft. He received his invoice from the company and made payment to the company by check. The records of the company show a credit of the remittance to Spiritus and not to Belle; this credit remains in the records. The draft was for $26,856.90, whereas Spiritus' payment to the company was $27,240.57. The lately discovered invoice, Exhibit 12, purporting to credit the payment to Belle, shows payment of the draft to have been $27,240 whereas it was, in fact, only $26,856.90. Furthermore there was other evidence in various circumstances fully warranting the jury in believing that the testimony of each defendant in this connection before the referee was false.

Counts 5 and 6 charge that Belle swore falsely before the referee that Jake called her by telephone, asking her to give Spiritus the money with which to get released a car of cheese; that she gave Spiritus $11,147 to pick up the draft but that Spiritus remitted only $10,000, because the market had dropped. The charge is further that Jake swore falsely that he asked Belle to take up the draft.

This car of cheese was shipped to North Egg Company, c/o Joe Blitz, New York; for it the Portage Wholesale Company drew a draft on North Egg Company, c/o Joe Blitz, in the amount of $11,160.71. Spiritus' checks aggregated $11,158.21. Two days later he remitted by check to Portage Wholesale Company $10,000, who received it and credited it to Spiritus' account. Spiritus testified that he received no money from Belle and never had any transactions or communications with her. Again the falsity of the oaths was corroborated by the circumstances previously related and others in evidence.

In counts 7 and 8 it is charged that Belle swore falsely before the referee that two certain cars of sugar and one of dextrose belonged to her; that she shipped them to Brockelman Brothers, Worcester, Mass., that they were bought from her by one Harry Robinson; that Brockelman Brothers remitted $26,179, their purchase price, to Portage Wholesale Company, and that Robinson also paid her $11,000 or $12,000 in currency; that this was her money. Jake testified that Belle was, as he understood it, entitled to credit for the $26,179.

These cars were shipped by American Maize Company to Portage Wholesale Company. Upon arrival, the consignee paid the draft in the sum of $11,519.47 by its checks. The company then shipped the cars to Brockelman Brothers, invoiced to J. Blitz. Portage Wholesale Company telegraphed Brockelman Brothers for an advance on the cars of $26,000 and at the request of Brockelman Brothers, the latter's bank telegraphed $26,179 to Portage Wholesale Company, who credited the payment to the account of Blitz Products Company, but posted it to the account of Joe Blitz.

Robinson, who acted for Brockelman Brothers, testified that he did not know Belle; that he dealt only with Jake and Jule Marachowsky and that he never had any transactions with Belle or paid her any money. Exhibit 14, another of the lately discovered exhibits, purports to invoice a sale of the three cars to Belle. No record of such an invoice appeared anywhere in the sales invoices of the company. Morrison testified, further, that, after bankruptcy intervened, Jake, while in Worcester, told him that some question had arisen about

sugar, and asked him, if he should be questioned about it, to state that he bought it from a subsidiary or some company other than Portage Wholesale Company, and that he told Jake that he would have to stand on the record.

We have referred to Belle's many statements and acts inconsistent with her testimony which tend to corroborate the falsity of her testimony before the referee in this respect also. Ample further corroboration is found in other circumstances in evidence.

Counts 9 and 10 relate to a transaction with Morrison doing business as Peak Products Company. Belle made oath before the referee that she sold a tank car of syrup to Morrison for $13,648, who remitted that amount to Portage Wholesale Company. Jake swore that this sum was due Belle. Both statements were alleged to be false. This car was shipped by American Maize Company to Portage Wholesale Company with draft attached to bill of lading. Portage Wholesale Company paid the draft for $5140.61 and, the next day, invoiced it to "Joe Blitz Corn Account" at $5607.28. Morrison had ordered the car from Portage Wholesale Company and gave his check for $13,648 to his bank in New York, who then wired the remittance to the credit of Portage Wholesale Company. Morrison testified that he never met or knew Belle before he saw her in the bankruptcy court; that he never had any transactions or communications with her; that he never bought anything from her; that he ordered the car of syrup from Portage Wholesale Company, and knew no one else in the transaction.

Again it is obvious that a witness testified directly and certainly to the falsity of the sworn statements of both defendants in this respect. The attending circumstances are fully corroborative, including the pencil note from Jake to Joe Blitz, listing the car at 16 cents a pound, the remittance to the company, and other facts and circumstances in evidence.

In counts 11 and 12 it is charged, in the first, that Belle swore falsely that she sold a car of dextrose to Jack Sims for $16,500; that she saw him in New York

and directed him to send the money to Portage Wholesale Company; in the second, that Jake made false oath that this was Belle's money.

This car was shipped by American Maize Company to Portage Wholesale Company, who paid for it, $7,285.32, and then invoiced it to "Joe Blitz Corn Account" at $7,735.32. However, Portage Wholesale Company borrowed on the bill of lading, from its bank, $16,500 which it credited to Blitz Products Company and posted to Joe Blitz. The car purported to be shipped from Portage by "Blitz Products Company," consigned to the same party, "care of Joe Blitz." The bill of lading was endorsed "Blitz Products Co. c/o Krueger" in Jake's handwriting. Jake sent Joe Blitz a note listing the price at $16,500 and informing Joe that the car was to go to Simms at Lorraine, Ohio. One Samuel J. Sens of that city had ordered the car by telephone directing it be sent to Peak Products Company. Sens is also known as Jack Sens and Jack Sainnes. Sens and Morrison of Peak Products worked together on the deal, selling the car to Monarch Wine Company, who paid the draft for $16,500, drawn by Portage Wholesale Company.

Sens testified he did not know Belle; that he dealt only with Jake and Jule Marachowsky and had no transactions with Belle. His testimony of the falsity of the defendants' sworn statements was corroborated by the foregoing circumstances and others, including Belle's own previous inconsistent acts and statements, the bank records and those of Peak Products Company.

In count 13 it is averred that Belle swore falsely that one Robert Blumberg owed her $43,700 for corn which she had sold him, and that he wired the payment to her in satisfaction of the debt. Blumberg operated the Canned Meat Corporation, in New York City, and shared an office with Sol Abramson, who dealt with him in various sorts of food products. He testified that he didn't know Belle; that he bought nothing from her, did not talk to her and had no transactions with her. It seems that Blumberg had some transaction with

Abramson, as a result of which he gave to the latter three checks aggregating $35,000 which Abramson later turned over to Jake or Belle. Later Abramson reported to Blumberg that Belle said Jake demanded more money and would not accept checks. Thereupon Abramson asked Blumberg to wire Belle $43,750 and he did so. Without prolonging the recital of evidence offered in support of this count, upon careful consideration, we are content to dispose of it with the observation that there is no direct testimony by Blumberg that he did not remit the money to Belle. What the transactions between Blumberg and Abramson, what, if any, the deals between Abramson and Belle and Jake, were all uncertain and conjectural; taken as a whole, the evidence is insufficient, we think, to sustain the verdict of guilty on this count.

In the 14th count, it was charged that Jake swore falsely before the referee that the invoices belatedly discovered appeared on the books and records of the company; that on December 23, 1946 he had "the sheets" before him and thought the entries were duly entered. We need not repeat the circumstances already recounted. The company bookkeepers, three in number, testified fully as to the records,—the cash receipts book, the ledger sheets, the general journal and the general ledger. In them were recorded the entries as originally made; in none of them appeared the invoices involved. No one of the witnesses had ever seen or heard of them. Indeed, an accounts receivable in Belle's name which they had seen had disappeared and had been missing ever since. Furthermore one of them, who prepared the schedules of creditors for the debtor proceedings, testified that Belle's name did not appear as a creditor anywhere in the books and that the records disclosed 'no debt due her. These facts, coupled with all the other evidence, made the issue on this count, a jury question.

█ Count 15 charged conspiracy by both to commit an offense against the United States, towit, to present and use a false claim and a false amended claim against the debtor's estate and to make false oaths in said proceedings in relation to said claims. Numerous overt acts were charged. Without further prolonging discussion of the facts, we think it clear that the evidence constituted proof sufficient to require that the questions involved in this charge against both defendants be submitted to the jury.

█ From the authorities previously cited, it is clear there can be no question that circumstantial evidence may legitimately constitute sufficient corroboration of a single direct witness to establish a charge of false oaths in a bankruptcy proceeding. See also United States v. Hiss, 2 Cir., 185 F.2d 822, 830; United States v. Seavey, 3 Cir., 180 F.2d 837, certiorari denied 339 U.S. 979, 70 S.Ct. 1023, 94 L.Ed. 1383; Radomsky v. U. S., 9 Cir., 180 F.2d 781, cited by defendants stands only for the proposition that where there is no direct testimony of a witness to the falsity charged, circumstances alone are not sufficient to sustain a conviction and distinguishes between such unsupported circumstances and documents emanating from the defendant, as was the case in United States v. Wood, 14 Pet. 430, 39 U.S. 430, 10 L.Ed. 527. The case is also additional authority for the proposition that documents originating with the accused are admissible. Thus Belle's inconsistent statements and claims were proper aids to the jury in its determination. Upon review of all the evidence we find no justification for defendants' insistence that the court erred in denying their respective motions for acquittal.

The court fully and carefully instructed the jury as to its duty as sole judges of the facts; the separate charges in the various counts of the indictment; the applicable statutes; the various rules pertaining to credibility; the presumption of innocence; the government's burden of proving guilt beyond all reasonable doubt; the nonevidentiary character of the indictment; what constitutes a reasonable doubt; the jury's duty to endeavor to reconcile the evidence with the presumption of innocence, if it could be done reasonably; the duty to ignore excluded evidence and arguments of counsel with regard thereto;

counsel and court comments on objections; expert testimony and the limitations on its effect; the fact that no charge of violation of ceiling prices was involved; the lack of materiality of the referee's ruling on Belle's claim; the definition of false oaths; the fact that even though testimony is false, if the witness honestly believes it to be true, it is not false; willful and conscious falsity; the requirement that to convict, there must be at least one direct witness contradicting the alleged false statement, and facts and circumstances corroborating the alleged falsity; direct evidence; circumstantial evidence; the requirements of the essential corrobative evidence; the duty to treat each count as a separate charge; the requirements of the rule as to each count; the essentials of proof of Count 14 against Jake and the nature of and the proof required under Count 15 charging conspiracy against both defendants. This charge, covering some thirty typewritten pages, was full, fair, impartial and complete in all essential details; it meticulously sought to protect defendants in all particulars and reflects a careful and studious attempt on the part of the trial court to safe-guard the rights of defendants and to advise the jurors fully of what was necessary to warrant a verdict of guilty.

◼ Notwithstanding the careful comprehensiveness of the charge, defendants urge that the court erroneously advised the jury that it might convict on circumstantial evidence alone and unduly and improperly commented in its charge upon the various single witnesses who testified in support of the respective counts. Defendants' assertion that the court undid what it had done in instructing the jury of the requirement of one direct witness and corroboration thereof, in its charge concerning circumstances and thereby led the jury to believe that it could convict on circumstantial evidence alone is, we think, wholly without merit. The part of the charge objected to appears in the footnote.[2] The court had already warned the jury of the strict requirements of proof governing charges of false oaths. It gave to the jury in this respect the instruction appearing in the footnote.[3] It is clear that when the court charged the jury as indicated, it had previously defined the essentials of proof. The later charge complained of was merely manifestation of the court's desire to explain fully the characteristics of circumstances as corroboration. No one

---

2. Sometimes circumstantial evidence is even more convincing than direct evidence, because direct evidence may depend upon the memory or observation and truth of one witness, while circumstantial evidence may be produced and depend upon the memory, observation, and truth of many witnesses who concur and agree, or upon physical facts, which cannot be mistaken and cannot speak falsely.

But to warrant your use of circumstantial evidence as a basis for finding the guilt of the defendants, or either of them, each fact necessary to the conclusion of guilt must be proven beyond a reasonable doubt; and all the facts so proven must be consistent with each other, and with the main fact sought to be proved; and the circumstances, taken altogether, must be of a conclusive nature, and producing, in effect, a reasonable and moral certainty of the fact to be established.

The mere union of a limited number of independent circumstances, each of an imperfect and inconclusive character, will not justify a conviction. They must be such as to create and justify full belief according to the standard rule of certainty. It is not sufficient that they coincide with and render probable the guilt of the accused. The facts so proven must be inconsistent with innocence, and incapable of explanation upon any other reasonable theory than that of guilt.

3. The corroborative evidence must be trustworthy.

Unless the evidence meets these standards, it is not sufficient to corroborate the testimony of the single witness.

If you fail to find that, as to any count, there is both direct evidence of the falsity of the statement and corroborative evidence, then as to that count you must acquit the defendant charged in that count. This means that, as to the first fourteen counts, you must carefully consider the evidence, and look in each instance to see if there is testimony of at least one witness which you believe directly establishes the falsity of the oath, plus corroborative evidence of the nature I have just described.

could possibly have been misled. Defendants' rights were safely guarded in this respect.

■ Defendants also contend that the court improperly commented on the evidence, in that it emphasized that as to each count not only must the jury believe the witness who had testified as to the falsity charged, but also that other evidence corroborated the direct testimony of falsity.[4] This, say defendants, was equivalent to saying that if the jury believed the witness and the corroborative circumstances, it should find defendants guilty. Again defendants have singled out one paragraph only, ignoring entirely the court's full exposition of the law governing what the government was bound to prove. Read as a whole, there can not have been the slightest confusion of the jury. The trial court may comment on the evidence if it does so fairly. This the court did here. Furthermore the objections taken to these portions of the charge were not sufficient to raise the point urged. Indeed, the record shows no objection at all by Belle, and an objection of an entirely different species by Jake. As a matter of fact one reading these specific charges can conclude only that they were beneficial to defendants.

■ Defendants urge that the court erroneously refused to give their tendered fifth instruction, in which they asked the court to charge that certain documents introduced in evidence were presumed to have been executed on the dates they bore. There was direct testimony by defendants that the documents were fully executed on those dates, and circumstantial evidence to the contrary by the government,—the reasonable inferences from all of which were for the jury. In this situation with evidence both pro and con, the presumption became merged with the direct issue of fact, to be determined, not by the presumption but, by the evidence pro and con. The presumption was no longer material or relevant. Inasmuch as the court had fully charged the jury of the government's burden, and this specific issue was one of fact, we find no prejudicial error in refusing this instruction.

■ We reach the same conclusion as to the refused sixth instruction which sought a charge that it was immaterial whether a certain contract would have been binding in a civil case. All other parts of the tendered instruction had been fully covered. This specific postulate was, we think, wholly immaterial. There was no issue as to the binding effect of the contract, if it was genuine; to have given this instruction might well have confused the jury by injecting an immaterial issue for its consideration. At any rate, the refusal to give it was, we think, entirely harmless.

Defendants' eighth and ninth instructions, refused by the court, sought to have the jury charged that it was immaterial whether the contracts and checks issued by a corporation were recorded. These instructions too, we think, tended to suggest to the jury an issue which was not presented. There was a controversy concerning the checks. The fact that they were not shown in the records of the company was a circumstance which the jury had a right to consider. Consequently, the instruction, insofar as the checks were concerned, would have been misleading. Furthermore there was no issue as to whether the contract had ever been recorded; that issue was not presented and was wholly immaterial.

■ By their sixteenth requested instruction, defendants sought to have the jury advised that a witness is not guilty of perjury when he swears falsely, if he believes the fact to be true, though without

---

4. Typical of the various charges in this respect is the following: "Before you can find Belle Marachowsky guilty on Count 1, or find J. H. Marachowsky guilty on Count 2, you must believe beyond a reasonable doubt; First, Mr. Frank Figge's testimony that he had no transactions with Belle Marachowsky, and that she had not given money to him personally and by her agent; and, second, that there is other evidence in this case which corroborates the testimony of Mr. Figge, and proves beyond a reasonable doubt that the defendant charged in that count knowingly testified falsely with regard to this transaction."

any reasonable cause. Apparently the objection to the refusal to give this instruction was not made within the time fixed by Rule 30 of Federal Rules of Criminal Procedure, 18 U.S.C. In the absence of unusual circumstances we are not justified in considering any alleged error in such situations. Coppersmith v. U. S., 4 Cir., 176 F.2d 353. However, on the merits, there was no prejudicial error in this respect, for the court had charged the jury that the issue, as to each defendant was whether he swore to what he knew to be false, that in this respect it is not an offense if a person swears to something which he believes to be true even though such testimony is false, that it is not an offense to be mistaken, and that one must willfully and consciously swear to that which he knows is not the truth. To our mind this fully covered everything that the tendered sixteenth instruction included. Of course, it was not necessary that the exact language of tendered instructions be followed. It is enough that they have already been given in substance. Sugarman v. U. S., 249 U.S. 182, 39 S.Ct. 191, 63 L. Ed. 550; May v. U. S., 84 U.S.App.D.C. 233, 175 F.2d 994.

 Defendants urge error in that the court admitted in evidence summaries of certain books of accounts of Portage Wholesale Company made by duly qualified auditors. The cash books, invoices, general journal and ledger were all introduced in evidence or made fully available to defendants before the conclusion of the trial, when it was still possible to cross-examine the auditors or to recall them for additional cross-examination. In this situation, the summaries were clearly admissible. Of course, the witnesses' testimony and their compilations did not cover all contents of the records; they purported to cover only those items as to which an issue existed. There was no occasion for them to testify as to the contents of the records as to anything not in controversy.

 It is insisted in behalf of Belle that the books and records of Portage Wholesale Company were inadmissible against her. It must be remembered, however, that both defendants were charged with conspiracy and that these documents were clearly admissible against Jake. If Belle desired an instruction that they were to be considered only as against Jake, she had the opportunity to request such a limitation in the charge of the court; this she failed to do. The court at great length explained to the jury the essential elements of a charge of conspiracy and of the requirements of proof sufficient to justify a verdict of guilty. If either defendant desired anything additional in that respect, the time and place to obtain it was then and there in the trial court. Coppersmith v. U. S., 4 Cir., 176 F.2d 353.

 Defendants' contention that the court improperly instructed the jury that the testimony of defendants before the referee was material to the issues under consideration by that official is without merit. Thus, in Sinclair v. U. S., 279 U.S. 263, at page 298, 49 S.Ct. 268, at page 273, 73 L.Ed. 692 the court said "And the materiality of what is falsely sworn, when an element in the crime of perjury, is one for the court. (Citing cases.) * * * It would be incongruous and contrary to well-established principles to leave the determination of such a matter to a jury." The second circuit in Carroll v. U. S., 2 Cir., 16 F.2d 951, at page 954 ruled likewise in these words: "But whether it was any 'material' matter was a question of law for the court, and was not for the jury", citing many cases in other jurisdictions.

 In further support of their contention that the court should have directed a verdict for each defendant, defendants argue at length the alleged insufficiency of the evidence. Of course the case is not tried here de novo. We have nothing to do with questions of credibility or weight of controverted testimony; we may inquire only as to whether the evidence, factual and circumstantial, together with the reasonable inferences to be drawn therefrom, made out a controverted question of fact for the jury. And in determining that issue we must necessarily consider the evidence in its phases most favorable to the government. Consequently we have carefully examined the voluminous record of parol and documentary evidence. After

such consideration, we conclude that it was entirely adequate to justify a finding of the jury that defendants entered into a conspiracy to secure allowance of a fraudulent claim against the bankrupt estate; that they manufactured and presented as genuine false invoices in favor of Belle and a false pretended contract between Jake and Belle; that each swore falsely in the bankruptcy proceedings, as charged in the respective counts, in support of the fraudulent claim. Of course, it was not necessary, in order to sustain the verdict, for the jury to make such broad findings. As to the substantive counts, it was essential only that the government prove the specific false oaths charged. The evidence amply supports a finding in that respect and meets fully the strict requirements of proof necessary to warrant a conviction for making false oath, even though we adhere to the harshness of that rule, despite the evident growing reluctance on the part of many courts to do so. We think it unnecessary to prolong this discussion. We merely add that other contentions of defendants are without merit.

Finding no error in the trial, the judgments as to all counts, other than the thirteenth, must be affirmed. The judgment on that count is reversed. In all other respects the judgments are affirmed.