237 F.2d 493
 UNITED STATES of America, Plaintiff-Appellee,
v.
Lyman B. JONES, Blanchel A. Murrelle, David J. Maxin, Milton
g. Severinghaus, Earl C. Raphael, William F.
Robichaud and Eugene R. Flitcraft,
Defendants-Appellants.
 Nos. 11650-11652, 11658.
 United States Court of Appeals Seventh Circuit.
 Oct. 23, 1956.
Rehearing Denied Nov. 15, 1956.
 
 Robert C. Eardley and Daniel F. Ward, Chicago, Ill., for Milton G. Severinghaus.
 John McMahon Murphy and Ralph J. Gutgsell, Chicago, Ill., for Lyman B. Jones, Blanchel A. Murrelle and David J. Maxin.
 Eugene T. Devitt, Chicago, Ill., for Earl C. Raphael, William F. Robichaud and Eugene R. Flitcraft.
 Robert Tieken, U.S. Atty., Edward J. Calihan, Jr., Asst. U.S. Atty., Chicago, Ill., John Peter Lulinski, Asst. U.S. Atty., Chicago, Ill., of counsel, for appellee.
 Before LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 Defendants have appealed from a judgment of the district court entered upon a jury verdict finding them guilty on eleven counts of an indictment charging defendants (and other persons[1] and certain corporations)[2] with a scheme or artifice of using the mail to defraud, 18 U.S.C.A. § 1341, and one count thereof charging a conspiracy to violate § 1341, 18 U.S.C.A. § 371.
 
 
 2
 Defendants, now appealing, pleaded not guilty. At the close of the government's case and again at the close of all the evidence, each of these defendants made a motion for a judgment of acquittal, which motions were denied. Their motions for a new trial were also denied. They were sentenced to the custody of the Attorney General for specified periods of time.
 
 
 3
 In brief, the conspiracy count charges that the defendants (including those who are now appellants), continuously from on or about September 1, 1951 to the date of the indictment (April 27, 1954) conspired to violate § 1341, 18 U.S.C.A., and that it was the intention of the conspiracy and of the said defendants to use the United States mails in furtherance of a scheme and artifice to defraud. The count sets forth twenty-three overt acts occurring in the period commencing on or about November 17, 1951 and ending June 27, 1953.
 
 
 4
 As to the conspiracy count, it is the government's theory that appellants entered the conspiracy after it had been formed and before its final completion to assist in carrying out the conspiracy, and thereby were a part of such conspiracy even though they were not members thereof at the time of its inception. The court instructed the jury that that is the law. Said defendants do not in this court disagree with that statement of law.
 
 
 5
 Among the salient facts as established by the evidence, viewed in its aspects most favorable to the government, United States v. Marachowsky, 7 Cir., 201 F.2d 5, at page 18, are those which we now set forth.
 
 
 6
 Late in the year 1951, several of the defendants (not any of the persons here involved) conceived the idea that a device could be manufactured, which would, when installed upon a television set, automatically activate said television set for the first four minutes of every half hour. The plan was based on the assumption that someone who watched the program for four minutes might be induced to place a coin into a coin slot installed on said television set, and thus see the balance of the program. This device will hereinafter be referred to as the 'Previewer'.
 
 
 7
 The defendants thereupon conferred with the Zenith Electric Company, a manufacturer of a clock-operated switch, of such type as is normally used in turning hall lights on and off in apartment buildings.
 
 
 8
 Immediately upon the formulation of this idea, Thompson, one of the originators of the scheme, began to set up a sales operation and the three corporate defendants were organized.
 
 
 9
 Preview was the parent corporation, and was principally concerned with the sales and installations of the television sets with Previewer attached thereto. The second corporation was AITM, which purported to be a national organization of the leading television manufacturers of the United States. AITM was almost completely fraudulent for the following reasons: First, it had no nationally known television manufacturers belonging thereto. In fact, throughout the duration of its entire existence, the only television manufacturer which later became a member was the Transvision Television Company, which contracted to manufacture the television sets which were ultimately sold and installed by Preview. These sets were manufactured with a coin device attachment, and were wired to accept the installation of Previewers. All AITM correspondence was carried on in the office of Preview. Its Washington office was, for the first seven or eight months of its existence, a letter drop set up through the employment of a secretarial service to mail out literature prepared in Chicago, so that the envelopes bore a Washington postmark. All incoming mail to AITM in Washington was forwarded to Chicago for reply. AITM, according to its correspondence, posed as a watchdog of the entire television industry, which had caused the organization and licensing of Preview to conduct the electronic Previewer program.
 
 
 10
 The United States Sign Corporation was the third organization. It was designed to sell to motel owners and operators, for the sum of approximately $395, an electric sign which actually cost about $97.50, and which sign advertised the presence of the Preview television system in the motel.
 
 
 11
 The salesmen first contacted the motel operators and owners, who had previously been advised that their motels had been selected to have the Previewer installed free of charge to them, and secured a lease from such motel owners and operators, permitting the installation of the Previewers; and at the same time they sold the motel owners and operators the electric sign. These leases were turned over to the defendant Hantover. The cost of securing such leases was borne through the profit made on the sale of the signs. These leases which Hantover acquired without any apparent consideration were subsequently carried on the Preview books and in its financial statement as capitalization of $125,000. This financial statement included a fictitious $50,000 bank deposit. The only capital ever invested in Preview was $1,000.
 
 
 12
 Not included in the indictment is an organization known as Credit Clearing House which purported to be a responsible financial institution which checked the status of the prospective investor. Before any inquiry could be made by him as to the financial condition of Preview, he received a letter on AITM stationery referring to credit institutions said to have investigated Preview and to have found it to be in good financial conditions.
 
 
 13
 With these basic organizations set up, the investors were sold television sets with varying statements as to the status of the Previewer, which was never fully developed. On October 1, 1952 there was only one Previewer set working, and that one was in the exhibition room in the Chicago office.
 
 
 14
 While the investors paid $250 for a Previewer, the cost of this device was $25 for a master station and $10 for each substation; in other words, an investor who bought eight sets would pay $2,000 for the Previewer. The cost of the device was $25, plus $10 for each set, or $105.
 
 
 15
 The television sets were sold for approximately $550. These sets were purchased from Transvision at a cost of $149 initially, and later $190, per set.
 
 
 16
 As soon as the program got under way, defendant McReady posed for a picture which purportedly demonstrated the 'New Electronic Device' (the Previewer). He was described in the print accompanying the picture as the inventor of the device, 'his million dollar development'. He was selected because he was the most photogenic. The photograph was taken in the workshop of a television repair store in Chicago. The device upon which one of his hands rested was an admiral television set with the bottom of the chassis facing the camera, showing wires, resistors and other component parts. McReady was, in fact, an office employee, known as 'tear sheet McReady', so-called because of the printing and use of the picture and accompanying printed matter which was sent out in the mail and was designed to appear as a sheet torn from some mechanical-scientific type of magazine.
 
 
 17
 Numerous witnesses testified as to the inferior quality of the television sets sold by Preview, and nearly all witnesses testified that they had not received their Previewers.
 
 
 18
 The defendants contend that the evidence of their participation in the above-described venture did not constitute proof that they knowingly participated therein with knowledge of such unlawful agreement. Severinghaus contends that there is no direct evidence that he knowingly adopted any scheme to defraud.
 
 
 19
 Some of the defendants testified in their own behalf and some did not.
 
 
 20
 The defendants do not deny the existence of a scheme to defraud. They say, however, that they were not members in, nor a part of, this tremendous swindle, which involved sales of $1,775,000, of which approximately $750,000 was paid by investors, for a device which was never delivered, and which, from the proof in this case, was a mechanical clock device, still in a prototype stage, hailed as a million-dollar electronic invention.
 
 
 21
 The trial in the district court was lengthy. The transcript filed in this court consists of over 3000 pages. We have made an examination of the record before us and we find that it contains substantial proof to support the verdict of the jury. We are not at liberty to weigh the evidence nor consider questions of credibility or conflicts in testimony.
 
 
 22
 In Stoppelli v. United States, 9 Cir., 183 F.2d 391, at page 393, the court said:
 
 
 23
 '* * * It is not for us to say that the evidence was insufficient because we, or any of us, believe that inferences inconsistent with guilt may be drawn from it. To say that would make us triers of the fact. We may say that the evidence is insufficient to sustain the verdict only if we can conclude as a matter of law that reasonable minds, as triers of the fact, must be in agreement that reasonable hypotheses other than guilt could be drawn from the evidence. * * *'
 
 
 24
 We cannot so conclude as a matter of law. See, also, Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, at page 232.
 
 
 25
 Some of the appellants suggest that the district court erred when it ruled during the course of the trial that a prima facie case of conspiracy had been established and that the evidence received against certain members of the conspiracy might be received and considered as against all of them. We hold that there was no error in this respect.
 
 
 26
 For these reasons the judgment from which appeals have been taken is affirmed as to all appellants.
 
 
 27
 Judgment affirmed.
 
 
 
 [1]
 Bruce Hantover, Dell W. Kettering, Edward C. McReady, John Ponsaing, Herman Jess Rodnick, Cyrus Simmons and Nathan James Elliott, also known as J. Matt Thompson (hereinafter referred to as 'Thompson')
 
 
 [2]
 Preview Television Corporation, (formerly known as National Coin TV System, Inc., and Sometimes referred to herein as 'Preview'), United States Sign Corporation and American Institute of Television Manufacturers (sometimes herein referred to as 'AITM')