Joseph N. LATTANZIO, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15332.

United States Court of Appeals
Ninth Circuit.

April 22, 1957.

Rehearing Denied June 3, 1957.

John J. Bradley, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Louis L. Abbott and Joseph Bender, Los Angeles, Cal., for appellee.

Before STEPHENS, LEMMON and FEE, Circuit Judges.

STEPHENS, Circuit Judge.

Appellant, Joseph N. Lattanzio, was indicted and found guilty by jury of transporting, on or about September 27, 1955, a woman, Ernestine M. Noland, from Los Angeles County, California, within the Central Division of the Southern District of California, to Yerington, Nevada, for prostitution, debauchery and other immoral purposes in violation of Title 18, Section 2421 of the United States Code, commonly referred to as the "White Slave Traffic Act."

Two points are raised on this appeal.

### Denial of Motions for Judgment of Acquittal.

Appellant argues that his motions for judgment of acquittal, interposed at the end of the government's case and after all the evidence was in, should have been granted. He argues that the evidence was insufficient to warrant submission of the case to the jury.

The woman, Ernestine M. Noland, was known by several aliases, including Teen Howard, Teen O'Neil and Lee Thornton. Teen testified that she had been a prostitute before and after she met Lattanzio, the appellant.

On September 26, 1955, Teen went on a double date, and late in the evening, the two couples went to the "Keynoter Bar" in Los Angeles. Teen went up to appellant (whom she had not known before) and asked if he was Joe, stating she heard he was at the Town House (the "house" in Yerington, Nevada) and asked appellant how things were there. Appellant and Teen discussed what the prostitutes were making at the Town House, how much was received by the prostitute and as to other details.

Teen testified she and appellant met the next morning and that appellant told her that he was going to Nevada and that appellant called her that morning. Appellant testified that Teen telephoned him the next morning at his parents' home concerning having lunch with him.

It is undisputed that Teen packed up and went to the Town House in Yerington, Nevada, but how she got there is an important issue in the case. Teen's friend, Kathleen Ray Stuart, was present at the apartment Teen occupied with Thomas D. Howard, at the time Teen packed up and left; and the two women moved Teen's bags, clothing and a radio into Miss Stuart's automobile. The two then went to the "Office Bar" on Vine Street in Hollywood where they were joined by appellant. Teen testified that only general conversation ensued at the bar, while appellant testified Teen told him she was "having an awful beef" with her "boy friend" Howard and would like to get away and said to him, "Do you mind if it appears like I go with you?"

Teen, Miss Stuart and appellant then went to the parking lot, and the women placed Teen's belongings in appellant's car. Miss Stuart testified appellant invited her "to go along on a trip," but that she declined. She also testified that appellant said in a "jesting" manner:

"Why don't you come along on a trip, come along with us."

"I (Miss Stuart) said that I am perfectly happy where I am right now."

Miss Stuart observed the departure of Teen and appellant from the parking lot, and she did not see Teen again for several months.

Thomas D. Howard testified that after the women left his apartment, he walked to the vicinity of the parking lot and saw a car resembling appellant's driven off, that the man driver resembled appellant and that he thought the woman in the car was Teen.

Appellant and Teen testified that after they left the parking lot they went to the "Copper Cart," a restaurant in Los Angeles, had lunch and then went their separate ways, Teen saying that she removed her "gear" from the car and took a cab. Appellant said he left the "Copper Cart" ten minutes later and drove to Yerington, Nevada. Teen and appellant denied that appellant drove her to Nevada.

Appellant testified that he loaned Teen $50 that morning and left Los Angeles around 1:30 in the afternoon of September 27, 1955, and that he arrived in Yerington, Nevada, around midnight. He said he stopped for gasoline at one station and also at two "houses" at Mina and Hawthorne, Nevada. Appellant testified that when he arrived at Yerington, he first went to the Town House, but to that portion of the Town House which was residential, rather than the part of the house devoted to prostitution. He said around an hour later he went to the other part of the "house" where, within twenty minutes, he was confronted with Teen's presence. An agent of the Federal Bureau of Investigation testified that he interviewed Teen at the Town House on September 27, 1955, the day she arrived.

Teen testified that appellant did not drive her to Yerington, Nevada, but she refused to testify, on advice of counsel, how she got there. She further testified that on or about February 10, 1956, appellant "jokingly" told her that he was not going to jail, and if he did, something would happen to her.

Appellant testified that he was a so-called "manager" as well as a part-time bartender at the Town House.

 This Court recently stated, in Ege v. United States, 242 F.2d 879, 880, that:

"We hold that when the man puts up the money in advance, when it is used for the interstate trip by the woman in accordance with his plan, when he has persuaded and induced

her to make the trip for the purposes of prostitution, he has also caused the woman to be transported in violation of § 2421."

We think the jury could properly relate the $50 loan with Teen's presence in Yerington very early the morning following her presence in Hollywood, together with other evidence; and so related, the evidence can satisfy no hypothesis other than that appellant procured Teen's transportation to Nevada for the purposes alleged.

McTyre v. United States, 5 Cir., 1954, 213 F.2d 65, 68, cited by appellant is inapposite. In McTyre the Court pointed out that the government admitted that " ' * * * there is not one scintilla of evidence to be found in the record *tending to show* that the defendant transported the victim with intent to induce her to engage in prostitution.' " (Emphasis supplied.) We also note that the Fifth Circuit may apply a so-called "special rule" as to review of cases involving circumstantial evidence on appeal.[1]

Appellant claims that he was deprived of a fair trial when the trial court permitted the government to establish other violations of Title 18, Section 2421 of the United States Code. No motion for a mistrial was made. Appellant was asked by the United States Attorney certain questions related to a woman called "Peggy." It was already in evidence that Peggy was the proprietor of the Yerington house and that appellant was manager of the house. To the question as to whether he drove her to Yerington from Los Angeles, he answered "yes" and that he made three of four trips with her.

■ First, we fail to see where any other violations of the White Slave Traffic Act were established. Appellant stated he took Peggy from Los Angeles to Nevada, but "not at the time that she bought the place though." There was no evidence in the record which showed Peggy herself to be a prostitute, and thus, since she was not the owner of the "house" at the time of the trips, there would be no violation of the act. Secondly, the remarks made by the trial judge clearly indicated that he limited the testimony to the one trip charged in the indictment. See Davis v. United States, 8 Cir., 1956, 229 F.2d 181. In the instant case we find no improper cross-examination, but in any event it does not appear that appellant was prejudiced.

Judgment affirmed.

[1]. See cases collected in Note, Sufficiency of Circumstantial Evidence in a Criminal Case, 55 Col.L.Rev. 549, 550–551. We note that the Court in Vick v. United States, 5 Cir., 1954, 216 F.2d 228, 232 applies the rule applicable to this circuit and cites a decision of this Court, Remmer v. United States, 9 Cir., 1953, 205 F.2d 277–288 as authority. See Elwert v. United States, 9 Cir., 1956, 231 F.2d 928; McCoy v. United States, 9 Cir., 169 F.2d 776, certiorari denied, 1948, 335 U.S. 898, 69 S.Ct. 298, 93 L.Ed. 433; Charles v. United States, 9 Cir., 1954, 215 F.2d 831, 833–834; Randall v. United States, 9 Cir., 1954, 215 F.2d

587; Bateman v. United States, 9 Cir., 1954, 212 F.2d 61, 70–71; Schino v. United States, 9 Cir., 209 F.2d 67, 72, certiorari denied, 1954, 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087; Remmer v. United States, 9 Cir., 1953, 205 F.2d 277, 287–288, reversed on other grounds, 1954, 347 U.S. 227, 74 S.Ct. 450, 98 L. Ed. 654; Stoppelli v. United States, 9 Cir., 183 F.2d 391–393, certiorari denied, 1950, 340 U.S. 864, 71 S.Ct. 88, 95 L. Ed. 631. See also: United States v. Jones, 7 Cir., 1956, 237 F.2d 493–495; Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229; Brown v. United States, 8 Cir., 237 F.2d 281.